**COLLEEN FLYNN**, CSB 234281
ATTORNEY AT LAW
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(213) 252-9444 / (213) 252-0091 facsimile
E-mail: cflynnlaw@yahoo.com

**DONALD W. COOK**, CSB 116666
ATTORNEY AT LAW
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA 90010
(213) 252-9444 / (213) 252-0091 facsimile
Email: manncooklaw@gmail.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIANNA LACOSTE, an individual, | Case No. 2:24-cv-4166 |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| vs. | 1. False Arrest / 4th Amendment / 42 U.S.C. § 1983 |
| RYAN BERGNER (#290620), an individual; LAINA DO (#654280), an individual; and Does 1 through 10, all sued in their individual capacities, | 2. Excessive Force / 4th Amendment / 42 U.S.C. § 1983 |
| Defendants. | DEMAND FOR JURY TRIAL |

## I. JURISDICTION AND VENUE.

1. Plaintiff's claims arise under 42 U.S.C. §1983. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff's claims arise out of, *inter alia*, acts of personnel employed by the County of Los Angeles, causing injury to Plaintiff in the County of Los Angeles. Accordingly, venue is proper within the Central District of California.

## II. PARTIES.

3. Plaintiff Julianna Lacoste, an individual, is an independent photographer accredited by the National Press Photographer Association, and is and was at all times relevant hereto, a resident of the County of Los Angeles, City of Los Angeles.

///

4. Plaintiff is informed and believes and based thereon alleges that the two individuals named as defendants, Ryan Bergner ("Bergner") and Laina Do ("Do"), are both individuals and were at all times material hereto, deputy sheriffs employed by the Los Angeles Sheriff's Department ("LASD"). Bergner's LASD employee number is #290620, while Do's LASD employee number is #654280. Both are sued only in their individual capacities.

5. The true names of defendants DOES 1 through 10, inclusive, are not now known to Plaintiff who therefore sues these Defendants by fictitious names. Upon ascertaining the true name of a DOE Defendant, Plaintiff will amend this complaint, or seek leave to do so, by substituting same for the fictitious name. Plaintiff is informed and believes, and based thereon alleges, that each DOE Defendant is in some manner responsible for the injuries and damages herein complained of.

6. At all times material herein, defendants were each acting as the employee, agent representative, and officer of every other defendant herein, and within the course and scope of such employment and agency. All defendants were acting under color of state law.

### *Tolling*

7. On October 21, 2020, plaintiffs in *Berg et al. v. County of Los Angeles et al.*, U.S.D.C. no. 2:20-cv-7870 DMG, filed their first amended complaint ("*Berg* FAC"). *Berg* was and is a putative class action lawsuit. In the *Berg* FAC, the F.R.Cv.P. 23(b)(3) damages classes are defined to include persons like Plaintiff Ms. Lacoste who attended 2020 protests against police violence such as the September 8, 2020 South LA protest, protests at which LASD deputies falsely arrested persons on fabricated charges such as Cal. Pen. Code § 409, and used less-lethal excessive force against persons like Plaintiff. Under the *Berg* FAC's second, third and fourth causes, Plaintiff Ms. Lacoste is an unnamed class member of the damages classes.

8. On July 30, 2021, the *Berg* plaintiffs filed their second amended complaint ("*Berg* SAC"). As with the *Berg* FAC, the *Berg* SAC alleges F.R.Cv.P. 23(b)(3) damages

00159907.WPD

classes under federal and state law (second, third and fourth causes of action). The classes include persons arrested and injured the September 8, 2020 protest like Plaintiff Ms. Lacoste; hence, Plaintiff Ms. Lacoste is an unnamed class member of the damages classes alleged in the *Berg* SAC's second, third and fourth causes.

9. On April 3, 2024, the *Berg* court granted the *Berg* plaintiffs' motion for class certification (see ECF 121 in *Berg*). Hence, the statute of limitations on Plaintiff Lacoste's federal claims asserted in this case have been tolled since October 21, 2020 (filing date of the *Berg* FAC) through the present. *Agritech, Inc. v. Resh*, ___ U.S. ___, 138 S.Ct. 1800, 1804 (2018) ("[T]he timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint.").

***Related Cases***

10. ***First related case***: *Krizia Berg et al., v. County of Los Angeles, et al.,* 2:20-cv-07870 DMG (PDx), filed August 27, 2020, and presently pending.

A. *Berg* is class action lawsuit. Like Plaintiff in the present case, the *Berg* plaintiffs have sued various LASD officials (along with the County of Los Angeles) seeking damages. The claims in *Berg* include the arrests and uses of force (so-called "less lethals") at the September 8, 2020 South LA protest which also forms the basis of Plaintiff Lacoste's claims in the present lawsuit. Consequently, Plaintiff Lacoste is a class member of the *Berg* F.R.Cv.P. 23(b)(3) damages classes for which the *Berg* complaint seeks damages for Plaintiff Lacoste proximately caused by the same arrest event on which the present lawsuit is based. *See Berg* Second Amended Complaint ("*Berg* SAC") (ECF 63 filed 7/30/21), second, third and fourth causes; *see also* the Order filed April 3, 2024 in *Berg* (ECF 121) granting the *Berg* plaintiffs' motion for class certification.[1]

B. In both the present case and *Berg*, the 9/8/20 South Los Angeles protest

---

[1] At the appropriate time, Plaintiff Ms. Lacoste will opt-out of the two *Berg* classes in which she is an unnamed class member so that she can pursue her claims in her own name.

is at issue: *Berg* Plaintiff Ramirez was subjected to excessive force at the same time and in the same incident giving rise to the excessive force claim of Plaintiff Lacoste. *Compare Berg* SAC@ ¶29 (Ramirez's claim) *with* ¶¶14-43 *infra* of the instant complaint.

11. **Second related case**: *Julianna Lacoste v. County of Los Angeles, et al.,* 2:23-cv-4917 DMG (PDx), filed June 21, 2023, and presently pending ("*Lacoste I*"). As in this case, *Lacoste I* raises the same claims for false arrest and excessive force arising out of the same September 8, 2020 protest event in South Los Angeles. *Compare Lacoste I* Complaint (ECF 1) ¶¶19-22, 25, 32-39 *with* ¶¶14-43 *infra* of the instant complaint.

12. The difference between *Lacoste I* and the present case is that the instant complaint names two individual deputy defendants, Bergner and Do, whereas these deputies are *not* named defendants in *Lacoste I*. When Plaintiff filed *Lacoste I* she did was unaware of any evidence identifying Bergner as being directly responsible for the uses of force directed against her, and that Do was the deputy who arrested her. In January 2024, *Lacoste I* defendant County of Los Angeles produced records that disclosed to Plaintiff (or more precisely her counsel) that indicated that Do arrested Plaintiff on September 8, 2020. Then at the deposition of Bergner taken April 25, 2024 in *Lacoste*, Bergner admitted that he directed deputies under his command to use force as set forth in his September 8,2020 report, a copy of which is attached hereto as **Exhibit A**. Between Bergner's April 25, 2024 testimony, LASD policy on documenting uses of force, and the *Lacoste I* defendants' January 2024 document production, the only deputy identified as responsible for subjecting Plaintiff to excessive force on September 8, 2020, is defendant Bergner.

13. In *Lacoste I*, Plaintiff requested that defense consent to amending the *Lacoste I* complaint to add Bergner and Do as defendants, pursuant to *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1462, 1463-64 (9th Cir. 1988). Defense refused to do so. Since the *Lacoste I* court set March 1, 2024 as the cut-off date for amending the pleadings – a cut-off date set over Plaintiff's objection based on *Cabrales* (*see Lacoste I*, ECF 44 filed

11/16/23 @ 7:2-5) – Plaintiff has no choice but to file the present complaint which Plaintiff expects will be consolidated with *Lacoste I*.

## III. FACTS COMMON TO ALL CLAIMS.

14. Plaintiff is a commercial photographer and graphic designer who documents protests against police violence in 2020 as an independent photographer accredited by the National Press Photographers Association ("NPPA") (www.nppa.org).

15. In the evening of September 8, 2020, Plaintiff drove to the vicinity of Imperial Highway and Normandie Avenue in Los Angeles to document a planned protest against police brutality. Plaintiff parked on a neighborhood side street a few blocks east of Normandie Ave. and off of Imperial Hwy. The LASD had shut down the west-bound lanes of Imperial Highway east of Normandie Avenue. Deputies were in the street, on foot and on top of a large truck, dressed in riot gear, holding large, less-lethal weapons. They were facing a small, peaceful protest of about 50 to 75 people who were gathered on Imperial Highway just east of the intersection with Normandie. Between themselves and the protesters, the deputies had stretched a large metal coil barricade across Imperial Highway. A loud LASD helicopter was flying overhead.

16. Having previously seen LASD shoot less-lethal weapons at press and protesters at prior protests, for safety reasons on September 8 Plaintiff wore a helmet. In this regard Plaintiff was not alone. Many protesters and journalists wore helmets and other protective gear on September 8 in an effort to avoid serious injury if shot by deputies.

17. Plaintiff also wore a badge issued to her by the NPPA which had her photograph, name, and date of birth clearly displayed along with the NPPA logo.

18. Plaintiff, with a long strawberry-blond ponytail, black helmet, black tank top and blue pants, can been seen in this YouTube video, calmly taking photographs of the deputies with her single lens reflex camera and video with her phone. https://www.youtube.com/watch?v=t3iFkuOWpYY (beginning at the 6 minute 35 second mark Plaintiff is seen walking towards the camera). This video was taken by Hugo Padilla, a plaintiff in *Astorga v. County of Los Angeles*, Case No. 2:20-cv-9805 AB. (The

00159907.WPD

end of the video also captures the deputies shooting Mr. Padilla off his bicycle and arresting him near where Plaintiff was shot and arrested on W. 110th Street.)

19. Shortly after 9:00 p.m., LASD Sgt. Brian Muller begin giving dispersal orders directed at the protesters. Plaintiff, however, was not able to make out the announcements. A few minutes later LASD deputies, on foot or in vehicles began moving towards the protesters, rounding the corner from Imperial heading north on Normandie. The protesters complied, calmly moving back and away from the deputies. While this was occurring Plaintiff was near the front of the group so that she could document what was happening. She took photographs and was using her smart phone to live-stream the event in real time for people watching on Instragram.

20. Without warning the line of deputies, which Plaintiff is informed and believes and based thereon alleges included the Defendant deputies, then ran towards the protesters, firing weapons including tear gas munitions, and some that were exploding near Plaintiff. Like others, Plaintiff became frightened, turned and ran as fast as she could away from the shooting deputies, moving north on Normandie Avenue.

21. After running for some time, Plaintiff stopped to look around. Her face felt like it was on fire from the tear gas the deputies had shot. She perceived things were calming down as she did not see any deputies but did observe people leaving, going to their cars. She turned east on 110th Street, to return to her vehicle. Plaintiff was now almost half a mile away from the intersection of Normandie and Imperial Highway where the dispersal orders were given.

22. As Plaintiff was moving east on 110th Street several blocks east of the Normandie and 110th Street intersection, at the express direction of defendant Bergner one or more LASD deputies shot Plaintiff with a so-called less-lethal munition in her right hand, causing intense pain. She dropped her cell phone she had been holding in that hand. When she dropped the phone, it was live-streaming. Then a LASD deputy or deputies, again at the express direction of defendant Bergner, shot Plaintiff directly in the side of the head, snapping her helmet off of her head, and shot her in the shoulder as she

tried to find a safe location.

23. Plaintiff ran behind a car and put her hands up. A LASD deputy came around the car and put a gun in Plaintiff's face prompting Plaintiff to plea "don't shoot, don't shoot!"

24. A LASD deputy whom Plaintiff believes was a male, came up behind Plaintiff and grabbed her by her ponytail and her waist and slammed her face down onto the ground with such force that her camera which was around her neck broke under her. Then he put his knee on her back and her neck. She yelled, "I'm not resisting." Even though her wrist was injured, swollen and bleeding, one or more LASD deputies handcuffed Plaintiff with metal handcuffs tightly locked on her wrists, causing excruciating pain. A deputy whom Plaintiff believes was a male, kept his knee on Plaintiff's neck and she tried to tell him that she couldn't breath. The deputy roughly yanked her up off the ground and shoved her into the back of an LASD pick up truck which the deputies were packing with protesters.

25. Defendant Do arrested Plaintiff. When Plaintiff was arrested, she was near 1234 W. 110th Street, close to where both Hugo Padilla and Christina Astorga, plaintiffs in *Astorga v. County of Los Angeles*, Case No. 2:20-cv-9805 AB, were shot by one or more deputies with less-lethal weapons and arrested.

26. Plaintiff, in the back of the LASD truck, felt a warm sensation on her back and realized it was blood oozing from her injured hand. She begged the deputies to loosen the cuffs but they refused. Plaintiff started to have a panic attack. She was in shock, trying to comprehend what was happening.

27. As confirmed by the live stream video from Plaintiff's smart phone (the phone continued to live stream even though it had fallen to the ground), a deputy picked up Plaintiff's smart phone and carried it for a bit.  When the deputy realized the phone was recording, he dropped it on the ground and left it there instead of taking it to the station and booking it with Plaintiff's other property.

28. Plaintiff was arrested and jailed for almost nineteen hours for the alleged non-

00159907.WPD

violent offense of failing to disperse in response to the LASD's declaration of an unlawful assembly in violation of Cal. Pen. Code § 409. Rather than issuing Plaintiff and the others citations and releasing them in the field as is ordinarily required under state law and LASD policy, either one of the deputies or DOES moved Plaintiff and the others into a van and transported them to the LASD South LA station on Imperial Hwy.

29. At the LASD station on Imperial Hwy, Plaintiff was lined up against an outside wall with other arrestees. Instead of uncuffing Plaintiff and helping her take off her backpack, a deputy cut the backpack off of her with a knife. The deputies allowed a Fox News reporter to take photos of Plaintiff and other arrestees and one or more Deputy defendant or DOES used their personal cell phones to take photos of Plaintiff and other arrestees. Visible in the Fox news footage is a table where Plaintiff saw LASD personnel collecting everyone's property. It appeared to Plaintiff that LASD personnel were not making any attempt to separate the property by individual property owner.

30. Once inside the station Plaintiff was put in a cell, but, because her hand was bleeding so much, the deputies next locked her inside a bathroom.

31. It felt like a long time went by before the deputies took her out of the bathroom to book her, including taking her mugshot (Booking No. 6008226). The booking deputy tried to fingerprint her but her hand was so bloody the deputies decided to take her to the jail hospital at County-USC Medical Center.

32. The deputies who transported her to the hospital tried to scare Plaintiff, telling her, "you're going to die in here," "you're not going to get out of here." Plaintiff, afraid, asked the attending jail nurse not to leave her alone with them.

33. The transport deputies eventually took her back to the LASD station on Imperial Hwy. The next morning at about 10 a.m. they told her they needed to transport her to the County jail.

34. Plaintiff was very injured from being shot in the hand, head, and shoulder, having tight handcuffs on her injured hand, having been slammed onto the ground and a knee pressed into her neck and back, and now beginning to get sick.

-8-

35. The County jail facility would not admit her because she had a fever and because the hospital had not properly documented her injuries, including those to her neck and shoulder, and told the deputies to take Plaintiff back to the hospital. The deputies appeared to become angry when told to take Plaintiff back to the hospital. The deputies told her she would not get out of jail for days and refused to take her to the hospital. Instead, the deputies took her back to the LASD station on Imperial Hwy. It was now the afternoon of the day after she had been arrested. All the other arrestees from the night before had been released. She was the only one there. At one point Deputy Luna opened her cell door, telling Plaintiff in a menacing and threatening voice, "You're the last one here [and] no one knows you're here," before slamming the door shut.

36. Plaintiff was cold, sick, bloody and bruised. Instead of getting her medical treatment, the deputies verbally abused her, saying things like, "you're ugly, you look hideous right now." When Plaintiff said it was because deputies had beaten her up, deputies responded coldly with, "At least you didn't get killed."

37. The LASD refused to release Plaintiff on her own recognizance, setting bail for her release at $5,000. Plaintiff was bailed out and, at about 4:30 p.m. on September 9, about 19 hours after being shot and arrested, the LASD released her.

38. Plaintiff's bond paperwork states the charge against her as a violation of Penal Code § 409 – failure to disperse.  However, there was no probable cause to arrest a photographer walking six blocks away from an already dispersed protest.

39. Jailing Plaintiff overnight and requiring the payment of bail for her release violated Cal. Pen. Code § 853.6, which required Plaintiff's release on her own recognizance in the field or immediately after booking. There was no reason why Defendants could not process Plaintiff in the field and release her without prolonged handcuffing.

40. The jailing of Plaintiff also violated the LASD *Manual of Policy and Procedures,* Line Procedures, Prisoners, 5-03/115.05 -- Field Release of Misdemeanor Prisoners, which provides that "[m]isdemeanor prisoners shall be released in the field

00159907.WPD

whenever it is reasonable to do so," provided the arrestee is not intoxicated or charged with a violent offense. *See* https://pars.lasd.org/Viewer/Manuals/11719/Content/11787?showHistorical=True. But this provision was ignored by numerous LASD supervisors, including various high ranking supervisors.

41. Plaintiff's court appearance date was January 6, 2021. Counsel appeared for Plaintiff on January 6 but no criminal charges were filed. The District Attorney rejected the LASD's request to file a criminal complaint against Plaintiff. No criminal charges were ever filed against Plaintiff because there was no legal basis to do so.

42. On June 8, 2020, Los Angeles County District Attorney Jackie Lacey issued a written "news release" announcing that she would not charge anyone arrested for failure to disperse during anti-police brutality protests that took place in Los Angeles in 2020. The release stated: "Los Angeles District Attorney Jackie Lacey announced today that she will not file charges against any protester for [...] failure to disperse. [...] 'I believe whole-heartedly in free speech and support the right of protesters to demonstrate peacefully against historic racial injustice in our criminal justice system and throughout our nation.' "

43. Plaintiff is informed and believes and based thereon alleges that defendants were aware that the Los Angeles County District Attorney would not charge anyone arrested for failure to disperse during the September 8 anti-police brutality protest, deputies arrested Plaintiff for no other reason than to harass and intimidate her, and to punish her for exercising her First Amendment right to photograph the police in public.

## COUNT ONE

### False Arrest As Against Defendant Do and DOES

### (42 U.S.C. §1983 / Fourth Amendment)

44. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

45. Plaintiff's arrest on September 8, 2020, violated her Fourth Amendment rights against unreasonable seizures by :

-10-

A. Subjecting her to harmful injuring force even though Plaintiff had not committed a crime and was not threatening harm to anyone; and,

B. Arresting her in the absence of probable cause that the Plaintiff had committed any crime.

46. As a proximate result thereof, Plaintiff is entitled to recover compensatory and punitive damages as against individual defendants.

## COUNT TWO

### Excessive Force As Against Defendants Bergner and DOES

### (42 U.S.C. § 1983 / Fourth & Fourteenth Amendments)

47. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

48. Plaintiff's arrest on September 8, 2020, violated her Fourth Amendment rights against unreasonable seizures by arresting her in the absence of probable cause that the Plaintiff had committed any crime.

49. As a proximate result thereof, Plaintiff is entitled to recover compensatory and punitive damages as against individual defendants.

///
///
///
///
///
///
///
///
///
///
///
///

00159907.WPD

## PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

50. That this Court award Plaintiff compensatory damages, according to proof;

51. That as against any individual defendant, that Plaintiff be awarded punitive damages according to proof;

52. That this Court award Plaintiff attorneys fees and costs incurred in this action under 42 U.S.C. § 1988, Cal. Civ. Code § 52.1(i), Cal. Civ. Proc. Code § 1021.5, California's private attorney general's doctrine, and any other appropriate statute;

53. That the Court award costs of suit; and

54. And such other relief as the Court deems appropriate.

DATED: May 18, 2024

**COLLEEN FLYNN**
**DONALD W. COOK**
Attorneys for Plaintiff

By _____
                    Donald W. Cook

00159907.WPD

1

## DEMAND FOR JURY TRIAL

2

Plaintiff hereby demands a jury trial.

3

DATED: May 18, 2024

4

**COLLEEN FLYNN**
**DONALD W. COOK**

5

Attorneys for Plaintiff

6

7

By _____

8

Donald W. Cook

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00159907.WPD

SH-AD-32A (8/17)

COUNTY OF LOS ANGELES
# SHERIFF'S DEPARTMENT
*"A Tradition of Service Since 1850"*

DATE:    September 8, 2020
FILE NO:    920-07755-0378-399

OFFICE CORRESPONDENCE

**FROM:**    RYAN BERGNER, SERGEANT    **TO:**    DAMON JONES, LIEUTENANT
SHERIFFS RESPONSE TEAM            SHERIFFS RESPONSE TEAM

**SUBJECT:**    **CIVIL UNREST / SOUTH LOS ANGELES STATION**

On September 08, 2020, around 1600 hours, the Sheriff's Response Team (SRT), responded to South Los Angeles (SLA) Station regarding protest and civil unrest regarding the death of Dijon Kizzee.

Our mission was to provide structure protection and protect SLA station from any potential civil unrest that may result from the unruliness of protesters.

The SRT team established a perimeter in front of SLA station. SRT mobilized our vehicles and static barriers on Imperial Highway just west of the station at Mariposa Avenue. SRT also deployed vehicles and barriers on Imperial Highway east of the station. Our static barriers created a barrier between personnel and potential rioters.

While setting up the barriers, individuals started gathering around Imperial Highway/Normandie Avenue watching us set up. While sealing the perimeter, individuals would randomly approach the barriers and attempt to provoke deputy personnel with derogatory comments.

By 1900 hours, both the east and west end of South Los Angeles station was secure from any potential civil unrest. SRT remained on the street in a "Force Protection" posture waiting for potential protestors to arrive. As time passed, groups of individuals arrived who were very boisterous, agitated, and clearly angry towards our presence on the streets.

Over the next hour, the crowd steadily grew to over 150-200 people. The verbal attacks were steady and aggressively directed towards us. The physical demeanor of the crowd was changing. A large portion of the crowd was wearing all black, had black face coverings, and wearing protective helmets. Some had body armour, carried shields and had gas masks. Most of the protesters were carrying large backpacks, which is indicative of individuals associating with disruptive groups.

**Bergner report**    -14-    **EXHIBIT A**

**Sheriff's Response Team**                         -2-                         **September 8, 2020**

The crowd appeared very agitated and individuals in the crowd were utilizing microphones to share their disgust with law enforcement.  The crowd dynamics were becoming very tense and uncertain.

I watched as individuals were loading objects into backpacks, and strategically placing objects in the bushes of the shopping center located on the corner of Imperial Highway and Normandie Avenue.

At approximately 1930 hours, the SRT squad was in formation watching the crowd.  Several individuals randomly would walk up to the barriers and attempt to manipulate them.  Several verbal commands were given to the crowd not to touch the barriers.  Some individuals were given multiple verbal commands to stay away from the barriers.

It was very apparent by the language and the multiple individuals wearing protective gear and carrying shields that the crowd was becoming very volatile.  The demeanor of the crowd was beyond a peaceful protest.

The supervisors on scene, collectively decided unlawful assembly orders were eminent.  We directed a mobile field force (MFF) to block northbound traffic on Normandie Avenue at Imperial Highway.  The purpose of that was to alleviate any confusion as to which way the crowd needed to leave.

At 2010 hours, Sergeant Brian Muller #244802, via the MAD device, declared an unlawful assembly and gave the dispersal order to the crowd.  He gave the order several times and specifically directed the crowd to go west on Imperial Highway or northbound on Normandie Avenue.  His orders were loud and very concise.  He repeated the orders several times.  Each time he gave the dispersal order, he advised them they had to leave the area by 2025 hours, which was 15 minutes after he gave the first dispersal order.  The combination of the placement of the MFF and the verbal directions given, left zero confusion to the direction of travel for the hostile crowd.

Throughout the dispersal order, several members of the crowd attempted to use a megaphone and speak over the orders, but the volume of the dispersal orders prevailed.

Once the orders were completed, a large portion of the crowd backed away from the barriers and formed a large cluster at the intersection of Imperial Highway and Normandie Avenue.  All the individuals with the shields were in front forming a protective barrier for the rest of the crowd.  Several individuals were hunched down behind the shields, making it hard for us to

**Sheriff's Response Team**                        **-3-**                        **September 8, 2020**

see people (Common tactic used by rioters is to duck behind shield before they start throwing objects at us).

Sergeant Muller again gave the dispersal order and the direction of travel to the protestors.  The crowd failed to listen to the orders given and continued to congregate in the intersection.

At approximately 2025 hours, several members of the SRT opened up the barriers and the SRT trucks and the squad proceeded to move westbound on Imperial Highway toward the crowd.  Sergeant Muller again gave the order to disperse and the crowd did not react.

We continued to press forward, SRT from the east and the MFF from the south.  Suddenly, the crowd started launching frozen water bottles and miscellaneous fireworks in the direction of SRT.  Due to the formation of the crowd, individuals launching the objects were immersed within the crowd, making it difficult to target individuals.

SRT immediately responded with appropriate and directed force towards the hostile crowd.  At the intersection of Imperial Highway and Normandie Avenue, the following less lethal was deployed:

- Deputy Adrian Ruiz #519554 – (4) 40mm
- Deputy Duke Sanders #529480 – Approx. 200 Pepperballs
- Deputy Aaron Escobedo #621443 – (6) 40mm
- Deputy Lauren Britt #548512 – (6) 40mm
- Deputy Garrett Rifkin #609125 – (3) Stingballs
- Deputy Kirsten Aufdemberg #602939 – (7) Stingballs
- Deputy Nathan De Boom #606645 – Approx. (10) Pepperballs FN303
- Deputy Jose Hurtado #552712 – (3) Stingballs
- Deputy John Balarosan #511622 – Approx. (6) Pepperballs
- Deputy Jose Ramirez #503608 – (5) 40mm
- Deputy Kevin Cater #611688 – Approx.(50) Pepperballs

The crowd initially dispersed.  I directed the squad to hold their fire so we could reassess the situation.  I watched the crowd beginning to gather up again in a tight bunched group with shields and umbrellas on the outer portion of the circle.  At this point, SRT squad took over Normandie Avenue and we were facing northbound.

**Sheriff's Response Team**                    **-4-**                    **September 8, 2020**

Sergeant Muller again gave announcements via a portable speaker system to leave at once. The crowd ignored his command and again became very agitated. The crowd was gathering around Normandie Avenue and 113th Street. I continued to push the SRT northbound. We were again met with frozen water bottles, pieces of cement, and large caliber fireworks.

SRT immediately responded with appropriate and directed force towards the hostile crowd. At the intersection of Normandie Avenue and 113th Street. The following less lethal was directed and deployed:

- Deputy Gabriel Sanchez #515598 - (4) Stingball Grenades
- Deputy Sean Whiteman #632411 – (8) Stingball Grenades
- Deputy Andrew Muller #652887 – (1) Stingball Grenade
- Deputy Garrett Rifkin #609125 – (1) Blast Ball

Each time we engaged the crowd, they dispersed. Sergeant Muller continued to give dispersal orders, but the crowd continued to ignore them. The crowd reformed in clusters in the middle of Normandie Avenue. SRT continued to push northbound Normandie Avenue, when we were met with hostile rioters. Large caliber fireworks, and large solid objects were again being thrown directly at SRT personnel.

SRT immediately responded with appropriate and directed force towards the hostile crowd. At the intersection of Normandie Avenue and 112th Street. The following less lethal was directed and deployed:

- Deputy Adrian Ruiz #519554 – (5) 40mm
- Deputy Robert Okamoto #511813 – (1) Stingball Grenade
- Deputy Aaron Escobedo #621443 – (1) Smoke Grenade
- Deputy Spencer Zagurski #550493 – (1) Blast Ball , (15) Pepperball
- Deputy Jose Ramirez #503608 – (3) 40mm

Each time we engaged the crowd, they dispersed. Sergeant Muller continued to give dispersal orders, but the crowd continued to ignore them. The crowd reformed in clusters in the middle of Normandie Avenue. SRT continued to push northbound Normandie Avenue, when we were met with hostile rioters. Large caliber fireworks, and large solid objects were again being thrown directly at SRT personnel.

**Sheriff's Response Team**                     **-5-**                     **September 8, 2020**

SRT immediately responded with appropriate and directed force towards the hostile crowd.  At the intersection of Normandie Avenue and 111th Street. The following less lethal was directed and deployed:

- Deputy Jonathan Lui #538097 – (1) 40 mm
- Deputy Adrian Ruiz #519554 – (4) 40 mm
- Deputy Andrew Muller #652887 – (1) Stingball Grenade

Each time we engaged the crowd, they dispersed.  Sergeant Muller continued to give dispersal orders, but the crowd continued to ignore them.  The crowd reformed in clusters in the middle of Normandie Avenue.  SRT continued to push northbound Normandie Avenue, when we were met with hostile rioters. Large caliber fireworks, and large solid objects were again be thrown directly at SRT personnel.

SRT immediately responded with appropriate and directed force towards the hostile crowd.  At the intersection of Normandie Avenue and 110th Street. The following less lethal was directed and deployed:

- Deputy Nathan DeBoom #606645 – (10) Pepperballs FN303
- Deputy Jose Hurtado #552712 – (3) Stingball Grenades
- Deputy Jose Ramirez #503608 – (2) 40mm

SRT engaged the hostile crowd on five separate occasions before they finally dispersed.  Approximately (19) arrests were made throughout the entire incident at various locations along Normandie Avenue.  We were unable to contact any individuals in the crowd that were directly impacted by the less lethal deployments.

All SRT members acted within department policy and displayed discipline when physically engaging with the crowd.